Good morning. This is the time set for the argument in the case of CAPEEM v. Torlakson. Mr. Caton, you may proceed. Good morning, Chief Judge Thomas, and may it please the Court. I'm Glenn Caton on behalf of the appellants. I'd like to thank the Court for continuing this hearing on my request. I know it was an inconvenience, and I appreciate that. I'd like to reserve five minutes for my rebuttal, and I will keep track of the clock for that. This is a case about Hindu schoolchildren in the California public schools. And when sixth and seventh grade children go to school, they learn about history and social science, including the history of world religions. And everything that they learn is grounded in the standards and framework, both of which we challenge, and both of which are developed by the California State Board of Education and are approved by the SBE. Now, in the depiction of religion in the standards and framework, only Hindu children learn from a curriculum that disparages their faith. I would like to invite the Court's attention to a part of the record, which is ER 2644 through 2646, that we filed in connection with our opposition to the SBE's motion to dismiss. And this is, of course, at the pleading stage, and the Court took judicial notice of the entirety of the standards and the framework. And in these tables that are in the excerpts of record I just identified, we excerpt directly from the standards and directly from the framework to show that when the standards explains the origin of different religions, including Judaism, Christianity, Islam, and Buddhism, they are very generous in their descriptions, and in a nutshell, they describe the religions from the perspective of a believer. And they will often say, you know, Christians believe or Christian doctrine provides. And it will go on to say things like Judaism originated one God who sets down moral laws for humanity. Jesus of Nazareth is described in the New Testament and described the contribution of St. Paul the Apostle. All basically the virtues of the faiths and the origins and some of the narratives. The standards don't do any of this for Hinduism. The standards describe Hinduism in purely secular terms. There is no acknowledgment of the divinity that Hindus believe is the basis of their faith. And what's worse is that the standards actually use derisive terms to describe Hinduism, describing the religion as evolving from Brahmanism. Now, Brahmanism Hindus consider an offensive term. It's basically an iteration or a euphemism for the caste system. So you have the State Board of Education telling Hindu students that their faith evolved from the caste system. And the bullet in the standards that immediately precedes the mention of Hinduism refers to the so-called Aryan invasion theory, which is a completely debunked theory that Aryans invaded South Asia and brought civilization and developed the Hindu religion. Even the experts who the State Board relied on during the framework process, and basically all scholars and experts agree that the Aryan invasion theory is false. Yet, Hindu students are taught that that's the origin of their faith. The bullet in the standards after mentioning Hinduism evolving from Brahmanism refers to the caste system. And this is an ongoing theme throughout the standards and the framework, and the textbooks that are based and by law must be aligned with the standards and framework. There's almost a fetishization of the caste system, and the framework actually directly attributes it as a religious belief. Mr. Caton, could I interrupt for just a moment? This is Judge Schroeder. Your argument so far sounds very much as if you are challenging the content of the curriculum. And I'm wondering what is our best authority for saying that we can oversee as a federal court the content of the curriculum when our Montero case seems to indicate otherwise. Montero is limited to our Equal Protection Claim and doesn't affect our Establishment Clause claim, which prohibits the derogatory treatment of religion the same way it prohibits endorsement of a religion. It also does not affect our Free Exercise Claim, which prohibits hostility or discrimination against a religion. But to answer Your Honor's question directly on Montero, Montero had to do with a school district selection of literature. And the Montero decision itself explained that the holding does not apply to policies. When the State Board of Education develops and approves standards and framework, I mean, there's no disputing that those are policies. It's not saying, you know, read Huckleberry Finn. The court in Montero said, look, just because a school district says you should read Huck Finn or the Faulkner novel, that doesn't mean that the school district is embracing everything that's in the literature, particularly the racial slurs that were at issue that appeared in those books. Policies are completely different. And at page 1032 of the Montero decision, the court says, nor do we preclude the prosecution of actions alleging that schools have pursued policies that serve to promote racist attitudes among their students. We conclude, ellipses, we conclude only that allegations that a school required that a book be read and then refused to remove it from the curriculum fails to provide a basis for an equal protection claim. So we think that Montero simply doesn't apply when we're talking about policies, which is what the Ninth Circuit said in that case. Well, but your argument relies on isolated portions of the standards. And you say that that translates into the content of the curriculum. But where from that do you get a policy? The standards and the framework are in our view. And I don't believe the state has contested that they are policies. The State Board of Education approves them. So the framework policy, but the isolated portions of it you claim are a policy designed to disparage your religion or establish other religions. And I'm not quite sure where we, how we just, we looked at two statements that you believe are false to create a policy that is hostile. Oh, I guess if we start with the premise that your honor seems to be accepting that the standards and the framework are policies of the State Board of Education, we are just identifying the parts of those policies that disparage Hinduism. Just like if there was something in the criminal code that was unconstitutional, criminal code is clearly a policy. And if there were parts of it that were unconstitutional for whatever reason, you know, you might identify sections of the criminal code that are unconstitutional. And we are identifying portions of the standards and framework that disparage Hinduism. And by definition, those portions are the policies of the standards and framework we believe. What is your basis though for saying that the standards and framework disparage Hinduism? It seems like there may be some disagreements about how to frame some of the history, but that's different from disparagement. Well, I think, well, first of all, it certainly can be different. I would submit, your honor, that the framing of how a faith is portrayed can itself be disparaging. If, for example, the standards say, learn about the Holy Trinity and Jesus of Nazareth and his teachings, which by virtue of doing that, students are going to learn that Christians believe, you know, that Jesus is the son of God and that Christians believe in the divinity of Jesus and in the divine inspiration of the New Testament. And then if you compare that to Hinduism, which, you know, supposedly evolved out of Brahmanism, its origins are in the Aryan invasion theory, and that caste is a central feature of the Hindu faith, then that, as your honor termed it, framing, is disparaging. I'd also point out that the standards refer to the Bhagavad Gita as literature and an aesthetic tradition, giving no acknowledgment that Hindus believe in the divinity of that work. And to say that a religion's holy book is a human creation, where the standards certainly don't do that for the Koran, the Torah, or the New Testament. So I think, you know, again, based upon what is highlighted in the chart that I just referred to, and that is also in our opening brief at pages 28 through 30, I mean, and the complaint is just filled with the details of the derogatory treatment of Hinduism in violation of the SBE's own policies, I should add, when the SBE does not violate its policies about not disparaging religion for any other faith. I mean, the complaint is very detailed in the ways in which the standards and the framework and the adoption of the framework were derogatory towards Hinduism. And certainly for the Equal Protection Clause claim and the free exercise claim, which the court dismissed, saying that it's implausible that there are viable claims there, that the district court was wrong as a matter of law, and that we adequately pled that the disparagement in the standards and the framework support an equal protection violation and a free exercise violation. And we should have been permitted to develop those claims. That was, so to focus for a moment, because Judge Bress's question really was about the derogatory treatment that underlies really each and every allegation of the complaint, other than those that provide the context for what the standards and framework are, and the injuries that were sustained by the plaintiffs. All of the derogatory treatment that I've described and that are in the table and in the complaint support three of our claims. The Equal Protection Claim and the Free Exercise Claim, which we believe are most ripe for reversal by this court. How is anybody's free exercise of religion being impeded by the standards or the framework? So that, Your Honor, you've identified a major discrepancy between our reading of the recent jurisprudence on the free exercise clause versus the state's. And the evolution of the Equal Protection Clause from Sherbert to Employment Division to Leukemia Babalu and then the recent string of cases is interesting. And I'm happy to get into as much detail on that as Your Honor would find helpful. But the long and the short of it is that after Employment Division overturned the Sherbert test, the Supreme Court has never held or found that there has to be interference with an actual religious practice. You know, the traditional kind of, you know, Jews can't wear a yarmulke, a Muslim woman can't wear a hijab, you can't pray. Like, those are obviously the very classic interferences that we think of when we think of the free exercise clause. But in the Trinity Lutheran case, in the Masterpiece Cakeshop case, and in the Espinoza case, the court made clear that you don't have to actually interfere with a religious practice. That discrimination against a religion, hostility towards a religion, and these are the key things that the court based its free exercise holdings on, is sufficient to violate the establishment clause. Well, let me just ask you one more question because your time is running down. What is the relief that you are asking for? Well, we're, in the simplest terms, we're asking for the court to reverse the dismissal of our claims and reverse the summary judgment. No, no, no. What is the junction of some sort? Oh, I think it would make most sense for the court to simply reverse, and I would assume that in a written opinion the court will explain what aspects of the standards and framework are unconstitutional, which we submit, we mapped out in our briefs, and then the Board of Education can correct the unconstitutional portions of those documents. I don't think the district court would ordinarily craft an injunction. That's the district court's providence. It's up to this court, I would submit, to find that the district court got it wrong and explain why, and then the district court takes it from there. Thank you, counsel. Thank you. Proudy? Your Honors, Tom Proudy, Associate Appellees. I'll begin by considering some big-picture points that apply across all of the different issues. First, at each stage of the proceedings below, the actual content of the standards and framework was properly before the court on judicial notice. So even at the motion-to-dismiss stage, we do not accept plaintiff's characterizations. We look to the actual content. It's clear from Judge Breyer's rulings that he fully digested the standards and the framework, but he also said that he did. Docket 117 below says, quote, The court has reviewed the standards and the framework in their entirety. Reasonable people that do the same can see that the documents approach everything from a secular historical perspective. They discuss problematic facts about religions other than Hinduism. There is nothing overtly hostile or clearly false about Hinduism. They highlight several positive things about Hinduism, and the framework contains a seven-page appendix that is specifically devoted to ensuring that local educators treat all religions from a neutral and constitutional manner. Number two, the allegation that a person or a thing is anti-Hindu is a textbook example of a conclusion that is entitled to no weight. Yet it is remarkable how much of the complaint is dependent on a court's blind acceptance that a group of people or certain public comments were anti-Hindu just because plaintiff said so. The complaint referred to the South Asia Faculty Group as a collection of anti-Hindu professors. There weren't facts to support that. They talked about how public comments that those professors submitted were pat and flit anti-Hindu, but they didn't attach the public comments, which did get into the record through summary judgment in the supplemental excerpts at tabs 18 through 21. A fair reading of those shows that the professors were trying to make the framework more accurate. Number three, well, this is a good time to point out that Judge Breyer, in a summary judgment ruling, used the word misleading three different times. Each time was in reference to plaintiff's generalizations or characterizations of documents that the court could go and look at. Third, big picture point, it is a mistake to assume that there was one monolithic Hindu point of view expressed during the framework development process regarding any particular content decision. There were people born and raised in the Hindu faith that spoke out against eliminating discussion of the caste system, for example. They thought it was important for people to learn how certain early teachings were misused by privileged elites. The framework development process also saw that there was other religious communities, particularly the Sikh community, that made the argument that eliminating discussion of the caste system would be erasing the origins of their belief system. And a lot of these different viewpoints can be seen from collected public comments from groups other than the South Asia faculty group in the supplemental excerpts at tabs 22 through 31. Now moving on to content, plaintiff's complaint about alleged anti-Hindu content can be broken down into three different areas. The caste system, this Aryan invasion theory, and the notion that the documents fail to recognize that Hindus believe in the divinity of their religion. With respect to the treatment of the caste system, there are several important points about the framework's treatment of caste that cannot genuinely be disputed. First, the framework does not say that the ancient Indian social hierarchy was bad or strange or unfair or any other negative value judgment. In fact, the closest thing that the framework does to making a value judgment is to say that it, quote, provided social stability and gave an identity to each community. Number two, the framework says that over the centuries, the caste system grew more rigid. It also says in the record at 1727 that over the centuries, Hinduism evolved with the Bhakti movement, which emphasized social and religious equality. So at the same time that the framework says that the earliest stages of the caste system had some connection to early Hindu teachings, it also says that over the same centuries that it was growing more rigid, Hinduism was emphasizing social equality. So it actually presents Hinduism as a relatively progressive force. Third, the framework talks about caste, starts off the whole conversation as in all early civilizations, and it stresses the point that this was not strange and it was the norm in these ancient civilizations to have social hierarchies. Finally, the framework does note that the Vedas describe four main social categories known as varnas, and it parenthetically describes these as priests, kings and warriors, merchants, artisans and farmers, and finally peasants and laborers. However, plaintiffs have not alleged that this is false in any way. Mr. Prouty, I understand, but may I ask you specifically about the Aryan invasion passage? Because I understand that there was a good deal of input, there was notice and comment, there was consultation during the development of the standards in the guidelines. Why is that? Were there comments received that that should not be a part of the framework or the standards? There's nothing in the record about the development of the standards, and the complaint doesn't challenge the development of the standards. The standards are from 1998, and the standards have one bullet point that says, discuss the significance of Aryan invasion. Now, 20 years later, the framework is being developed. And by the way, the standards from 1998 say they do not exist in isolation. They must be read consistent with the revised curriculum. The framework makes no mention of Aryan or invading. It does talk about that there's a competing theories about how people speaking certain languages many thousands of years ago moved around the planet. And Judge Breyer dealt with this summary judgment ruling at 21 to 23 in the record. And he basically found that there may be groups that have a social political agenda that would be furthered by establishing that people speaking a certain language came into India from the north or more from the south. But it doesn't say anything about disparaging or endorsing religion. Plaintiffs have just said the Aryan invasion theory kind of ties in somehow with the origin of Hinduism, but it doesn't explain how. And the framework discusses competing theories. So there's nothing there that is denigrating Hinduism. You have to kind of buy into the concept that it would be better for some people's agenda for us to show that certain people came from the north instead of the south. But that's not the type of agenda that the establishment clause is designed to protect. Well, but my question was whether or not during any of the notice and comment in the development phase that anyone criticized the reference to that. I believe that there was 10,000 plus public comments and there was a lot of viewpoints from different things. I believe that a lot of the professors were saying that at one point in time, there was this Indus Valley civilization that kind of predates the Vedic civilization. And that civilization seemed to disappear. And at one point in time, there was a thought that they disappeared through people coming in and kind of invading and conquering. And now it seems that people have thought, well, maybe the civilization disappeared through things like rivers drying up, environmental factors, and that it wasn't people coming in and invading. And there's a lot of comments about wanting to kind of create continuation from that civilization to the early one. You can grab a hold of people's passionate public comments about that. But it is the majority theory, as far as I could tell from the comments, that there was a migration, not an invasion. So people speaking Indic languages did come in from the north, but it wasn't coming in and conquering. It was coming in and intermixing. So that's kind of the Aryan invasion theory. But there's no way that you can kind of connect that to say that telling the schoolchildren that there's these two competing theories about migration endorses or denigrates Hinduism. There's this notion of Hinduism being treated secularly in the framework. Judge Breyer, again, has addressed this at length in his ruling at pages 15 through 17 in his order. I can't say it much better than he does. But if you look at the framework at page 1687, the framework talks about Hindu faith recognizing, quote, Now, I think that it is reasonably and fairly implied, if not expressly conveyed by definition, that people that worship divine supreme deities actually believe in those deities. It's unclear exactly what more is wanted. It would be totally unnecessary and would sound condescending to my ears if the framework were to add Hindus believe that these deities they worship actually exist. The framework does also talk about ancient Hindu sages, such as Valmiki and Vyasa. That's on page 1687 of the framework. These are legendary Hindu sages, and it is believed in that faith that they received the word from this all-pervading divine supreme reality. And children will get to learn about that. The framework is not a curriculum, and it says so. It is not the end-all, be-all. It is the beginning. And it repeatedly stresses that local educators work with students with a guiding principle of student inquiry to look at primary source materials, learn the facts. And, of course, the educators will do that consistent with the appendix that stresses that religion must be treated carefully and neutrally. Now, turning to the claims, most were dismissed for failure to state a claim. There is one quick procedural point to note here. Plaintiffs, in their brief, whether you look at the table of contents, the issues, or any word in their brief, they never challenged the issue that when the claims were dismissed, they should have had a chance to read them. And if they did, I could have cited a bunch of cases in my brief of case law that touches on that. But one case that does touch on that a bit is the Fields Opinion, which both parties cited for the subpoena. Can I ask counsel just a little bit of an unrelated question? Is there any relevance, or what is the relevance, if any, of the prior Kapim litigation in the Eastern District of California? The prior litigation challenged a completely different process, and that is the State Board's adoption of instructional materials. These are textbooks that are drafted by third-party publishers, and this happened a decade ago under an earlier framework that was adopted in 2005. It would have played a part in this case because Kapim, the lead plaintiff in this case, didn't challenge the standards when they sued a decade ago. And so I would have had a good claim preclusion defense if it would have come to that in this case. But the standards were there because they were from 1998, but they didn't challenge the standards. They challenged textbooks drafted by third parties, and the district court in that case held on summary judgment that the establishment clause was not violated. It did address equal protection, but Judge Breyer below distinguished that case because in that case, the plaintiffs were alleging that there were different procedural rules and deadlines and processes that were put to bear on people supporting Hindu edits and whatnot. And Judge Breyer said there's no allegations like that in this case. Would you address the exclusion to Dr. Josie's report? That's correct. So now on summary judgment, there are several grounds for dismissing the expert report on summary judgment. And Judge Breyer's ruling specifically referred to the evidentiary objections that weren't in the excerpts, but they are in the subsequent excerpts at pages 3 through 6, 9 through 10, 15 through 17. There was not just one or two grounds for objections. There was four or five. Now, one of them is the relevancy problem. Judge Breyer's the gatekeeper, and this court's 1994 Brown decision affirmed the district court's determination that expert testimony is essentially irrelevant to the primary effect in court. And that's in the Brown decision at insight page 1382. There are several other cases from across the country, including from circuit courts, that agree with that approach, and those are cited in the supplemental excerpts at page 17. There's also the reliability problem, a completely independent basis for Judge Breyer to have, not abusing his discretion, excluded the report. And that requires the plaintiffs, they have the burden of proving that this isn't subjective opinion, that this is objective opinions that are based on scientific and reliable data. In this case, the expert, whose educational degrees were not in history, let alone ancient Indian history, said that she read parts of the standards, she read parts of the framework, and yeah, she agrees with the complaint that they're offensive and discriminatory. She cited a whole bunch of articles written by other people, including several that were written by members of the South Asia faculty group, and those were never made part of the summary judgment record. So that led to another basis for excluding the report, based off this court's 1999 decision, in race, citric acid litigation, which is discussed in the supplemental excerpts on page five of the entry, which basically say that if an expert is going to rely on facts for the truth of the matter, essentially, those facts from these extraneous sources have to be part of the summary judgment record. And the rationale for that is basically, you need to present the facts and data on which you're basing your opinion. And if you don't put that stuff into the summary judgment record, the testimony is inherently unreliable. There was also another ground about this issue of the expert report is not sworn under penalty of perjury. It was put in in the first instance, and then at the end of the summary judgment briefing, there was a reply declaration, and it said, I would attest to the contents of the report. It doesn't say what she would attest to about the contents. For all we know, it could mean, yeah, that's the introduction part. Yeah, that's this part that talks about the framework. She never states under penalty of perjury that the opinions or conclusions or the facts on which she bases them are true. And so Judge Breyer pointed that out as well. So again, the standard is abuse of discretion there, and Judge Breyer didn't abuse of discretion. For the free exercise clause, there's as near universal agreement in the legal community as there could be, that in 1990, when the Supreme Court decided the Employment Division Smith case, it was making establishing a free exercise clause much harder. That's why in 1993, Congress passed the Religious Freedom Restoration Act, and the very first element in there is a substantial burden. It's always taken for granted that there must be a burden because that's tied to the language of the clause itself, which bars laws prohibiting the free exercise of religion. So since 1990, this court, as all other courts have recognized, there needs to be a burden. We cited the Jones opinion from 2015. There are several others. If you just type in substantial burden in this circuit, you'll find decisions from members of this panel in recent years that are continuing to apply the substantial burden. Would you address the Trinity Lutheran and Masterpiece K-Chop cases? Trinity Lutheran and Masterpiece K-Chop both involve classic substantial burden. In Trinity Lutheran, there was a valuable tangible government benefit that was being given to people of a certain class. And churches would have called for it, but they said, don't apply it here at church. And the courts have found over the years that that's suffices for a substantial burden because it has a natural coercive effect if you want to abandon your religious character in order to get that tangible, valuable government benefit. Masterpiece K-Chop, the court, which I think seven judges agreed, had a very narrow ruling. But in that case, they recognized that just like it would be an exercise of religion for a pastor to say, I don't want to participate in your marriage under another religion or homosexual marriage, this K-Chop artist, this cake maker artist, it would be an exercise of religion for him to say, you can't make me make this artistic expression for your marriage. And so in that case, the state of Colorado was going to say, no, you're actually violating the law. You need to cease and desist. You need to provide us with these quarterly reports. And the Supreme Court basically said in certain circumstances, you would be able to do that. You could impose that burden. But when you adjudicate it in this commission, the people adjudicating it in that commission can't talk about how reprehensible they think the religious state is. But the burden is there. The burden is always there. I have 10 seconds left, so I would ask the court to affirm the judgment. Thank you, counsel. We'll hear rebuttal. I need to unmute, Mr. Kaden. My apologies. Thank you, Chief Judge Thomas. My first point is something that the state, the SBE did in its briefs and counsel continued today, which is to conflate the standards and the framework in order to try and basically ignore how brazenly unconstitutional the standards are. And I want to be clear that in the standards themselves, there is no aspect of the description of Hinduism that acknowledges the belief in the divine. It is purely secular and purely hostile, full stop. Now, it's true that the framework says that the standards should be viewed in connection with the framework, and that's fair enough. But you can't, I would submit that the SBE cannot just say, well, even though the standards treat Hinduism dramatically different from other faiths, let's look at the framework. And I'm going to ignore the parts of the framework that refer to secular origins of the faith, such as Brahmins and priestly families assumed the authority over complex devotional rituals and expounded their ideas as the origins of Hinduism. There is nothing like that in convoluted and secular terms to explain the origins of any other faith in the framework. We will readily acknowledge that there is mention of deities and a belief in oneness and some of the important tenets of Hinduism in the framework, but that does not erase the hostile and secular content in both the standards and the framework. But your challenge here is limited to the framework, isn't it? No, no, Your Honor. It's the standards and the framework, and we think that the constitutional violation... Right. That's not how the district court viewed it. I think that the district court understood that we were challenging both, Your Honor, but did note that they should be read together. But it is a challenge. It's clear from the complaint that we are challenging the standards, the framework, and the framework adoption process. Let me ask you, I want to follow up on Judge Schroeder's question. I understand what you're seeking from us, but I'm not sure what you're seeking in this suit as the ultimate remedy. Because you ask for enjoining defendants from all curriculum and instructional materials, and of course, that's vested in the local school districts. So what do you seek? If you were to prevail in the district court, what would the order look like that you would be seeking? I think the order would say that the court finds the standards and the framework constitutionally infirm, and identify the parts of the standards and the framework that we quote at length in our complaint and in our briefs, and say that these are constitutionally problematic because they disparage Hinduism, and that we instruct the State Board of Education to recraft the depiction of Hinduism so that it is consistent with the depiction of the other faiths, in that it readily acknowledges the belief in the divine origins of Hinduism does not equate caste as a Hindu religious belief. Mr. Prouty was talking about that there were people who spoke out that caste should not be erased. The appellants are not at all claiming that caste should not be mentioned or erased. It's just that caste should not be described as a Hindu religious belief, just like slavery should not be described as a Jewish or a Christian religious belief, even though there is mention of it in the Old and the New Testaments. State law requires that there not be depictions of religions that will reflect poorly on the students who practice those faiths. The list that's in our complaint and in our briefs, I'm not expecting that this court or the district court would wholesale adopt every single criticism we have as disparaging, but we think the overall gist is, and whatever portions the court identifies as disparaging of Hinduism, then the SBE should be instructed to revise those portions of the standards and the framework to be consistent with the depiction of other faiths. You're over your time, counsel. Are there any further questions? Thank you both for your arguments today, and we will be in recess. Thank you.
judges: Schroeder, Thomas, Bress